Parrish *v.* Stephens.

*Referred from Washington.*

1. No particular time is necessary to establish an abandonment of land to the public.
2. It is sufficient if it be used by the public, with the assent of the owner, for such time that an interruption would be an injury. Each case depending on its own circumstances.

THIS is a suit in chancery by the owner of property on Water-street, in Portland, to enjoin the proprietors of the

town, and their vendees, from erecting buildings on the river bank, in front of the plaintiff's premises. The bill was filed in 1850, and an injunction allowed by Pratt, Justice; after which, the proprietors, particularly Coffin, as he states, set on foot a compromise with the citizens, whereby a portion of the levee was to be private property, and the remainder a public way; and pending the negotiation, Coffin and others, claiming under the proprietors, erected valuable buildings on the disputed ground. The compromise failing, the parties revert to their original rights, and bring the title of the entire levee under adjudication.

The cause came on to be heard in the Washington District Court, and under a late statute has been adjourned to this court for decision. The record and depositions are too voluminous to be set forth, but the prominent facts, and the most material evidence, will be found in the opinion of the court.

*J. McCabe,* for plaintiff.

*A. Campbell,* for defendants.

OLNEY, J.  In 1845, F. W. Pettigrove and A. L. Lovejoy, as joint owners, laid out the town of Portland, and caused a plat to be made exhibiting blocks of lots, designated by numbers, with blank spaces between them, which coalesced with each other at their intersections, and with the surrounding blank spaces at the sides of the plat. Near the first row of blocks the Willamette River is laid down at such a distance as to leave a narrow strip between, which, owing to the meanders of the river, is of variable width, being in some places narrower, and in others wider, than the blank spaces between the rows of blocks. The front row of blocks is, at the lower end, deflected from a right line, to conform to the bend of the river, by which means it continues of the same width as the intervals between the blocks, instead of narrowing to a point as it otherwise would. The sizes of the lots and blocks, and the width of these several spaces, are not

marked; nor is there any evidence on the face of the plat that the spaces were intended for streets, except that they form a connected net-work of open space among and in front of the blocks, making all the lots accessible from each other and from the river, which is here an arm of the sea, within the ebb and flow of the tide, and a resort for shipping.

Upon this strip of ground, between the river and the front row of blocks, the obstructions are being erected. The proprietors claim that the street in front does not cover the entire strip, but leaves a narrow margin along the bank, not dedicated to the public, and on which they have sold lots and erected buildings. Their right is contested by the citizens, who claim the entire strip as public ground; and whether it be public or private property, is the question to be decided.

Upon the face of the plat there is the same evidence that this strip is a street, as that those spaces are streets which separate the rows of blocks. The cross streets terminate at its inner edge, and do not traverse it and terminate at the river; and if it be not a street, then the continuity of the streets is broken, and half the lots fronting on this strip are inaccessible without passing over private property. Indeed, it is admitted to be a street, and its eastern boundary alone is disputed. But the plat carries on its face no evidence of any other boundary than the river. As before stated, neither the width of the strip, nor the width of a street to be taken out of it, is stated; nor is any line drawn upon it between the front lots and the water line of the river; nor is any other intimation given that the entire strip is not as much a street as the entire strip between any two rows of blocks. It is not unreasonably wide for the quay of a commercial town, but on the whole, rather narrow for that purpose, being, in much of its extent, narrower, and but for a slight curve in the river, would be nowhere wider than the ordinary streets of the town. And yet, from its location, it must necessarily be much more used than any other, for the carting of goods, and for the ordinary uses of city streets; and besides, it must be the receptacle of all the goods imported and exported by the

vessels resorting there. It is quite as important to the town proprietors as to the individual lot holders and other citizens, that the loading and unloading of vessels, which confers upon the town its principal importance, should not be embarrassed by the caprice and avarice of private persons who might own the land adjacent to the water; and they appear by the face of the plat to have adopted, as reasonable men, the usual and proper means of guarding against this evil. That this street was intended to adjoin the river, to form the connecting link between all the highways of the town and the great highway of water, upon which the town is dependent, is, therefore, both reasonable in itself, and apparent from the face of the plat.

The Supreme Court of the United States, in passing upon a similar case which arose in Pittsburg, appears to have considered such a plat sufficient proof that the street extended to the river. They say " there is nothing on the plat which shows any limit to the width of Water-street, short of the river on the south. If a line had been drawn around its southern limit, there would have been great force in the argument, that the ground between such line and the water was reserved by the proprietors." (*Barclay* v. *Howell*, 6 *Peters*, 498.) And the Wellsville case was decided the other way by the Supreme Court of Ohio, because there *was* such a line, as well as a natural boundary, namely, a precipitous bluff, along the brink of which the outer line of the street was drawn upon the face of the plat. The street was bounded on the plat by two parallel straight lines, and in the open space between them was written, " width, 66 feet;" and the strip between this street, thus marked, and the river, from the top of the bluff to the water, was from 150 to 200 feet; nearly equal to a row of blocks in Portland. It was, therefore, evident, from the plat and topography of the place, that the street was confined to the level ground and the top of the bluff; and there being no other evidence of dedication, but rather the contrary, the strip was held to be private property. (*McLaughlin* v. *Stephens*, 18 *Ohio*, 94.) In Louisiana, where

this subject assumed unusual importance from the widening of these quays by alluvial deposits, and where it has been thoroughly studied and discussed, such plats are considered sufficient evidence of dedication ; and Chancellor Kent cites approvingly the opinion of Chief-Justice Martin of that State—a jurist, venerable, he says, for his age, learning and character—that when the plan of a city, fronting on a navigable river or the sea, has an open space between the front row of houses, or street, and the water, in public use, it becomes a part of the port, without any other designation or evidence of dedication. (3 *Kent,* 428, *note.*) This is precisely such a case, such a plat, such a strip, and such a public use of it. And if the case stood upon this alone, there would be very little danger of error in pronouncing in favor of the dedication.

Before dismissing the case as made by the plat, it is proper to notice a document which is relied on as a limitation of the street to a part only of this strip. Only a copy of the plat is in evidence admitted by both parties to be correct, except as enlarged by subsequent additions. The absence of the original, which was made for the proprietors by Brown, the surveyor, is unaccounted for. The document referred to is upon a sheet exactly like that on which the plat is copied ; and the back of the plat is placed against the face of the document, and the two are pasted together at the upper edge, so as to appear like a single sheet, and so that the document, if its presence were suspected, or the duplication of the sheet discovered, is to be found by raising the plat at its lower edge. The document is in tabular form. The columns are headed, respectively, " To whom sold," " When sold," " No. of block." In this tabular exhibit of sales one entry only is made, namely : " William Warren, January 1st, 1848, Lot 4, Block 27." As a caption, over the top of this table of sales is written : " All lots are 50 by 100 feet. Water-street, in front of blocks Nos. 4 and 5, is 30 feet wide, in front of blocks Nos. 1 and 8, is 60 feet wide. All other streets are 60 feet wide."

When and by whom this copy of the plat and this private document were made, does not appear. The plat shows more

than double the number of blocks originally laid off, all written in the same hand, with the same ink, and evidently at the same time, and must, therefore, have been prepared after those additions were made to the town.   It contains the name of Stark, written in vacant blocks, as if to indicate a reservation, and must, therefore, have been made after he became a joint proprietor.   And as the first sales were made in 1846, and the first and only entry in this table of sales is dated in 1848, it is probable the document was prepared about the latter date—some three years after the town was laid out, and when it had become the metropolis and emporium of the country, and the proprietors, as the evidence shows, had been importuned to sell lots on the river bank.   If it had been made before that time, the first entry would have been made of some prior sale.   If this memorandum was not an after-thought, why is it hid away where no one would look for it, or be likely to find it by accident, instead of being written on the plat in the usual way, where an interpolation would be detected?   And if it was likewise attached to the original plat, why has not that fact—the very fact on which the case might turn—been proved by the production of that plat, or by oral evidence after showing its loss?   We get our first knowledge of this memorandum from the witness Hanner, who says that in 1849 or 1850, Coffin showed him a map by which he discovered that the streets were 60 feet wide, leaving a fraction along the river, part of which he proposed to buy, but Coffin declined selling, for the reason that he wished to leave it vacant for public use.

The witness, Pettigrove, after looking at this copy, states the size of the lots and width of the streets to the same effect, except that Front-street, as he calls it, is 30 or 35 feet in front of blocks 4 and 5; and he adds, " As will be seen by the original plat."   But the absence of that original not being explained, its contents cannot be insinuated in this illegitimate, unsatisfactory and suspicious mode; and if it could, the memory of this witness, if not his veracity, would be an unsafe foundation for a solemn decree, as will presently be seen.

Parrish *v.* Stephens.

All the other numerous witnesses, several of whom speak of the original plat, and most, if not all of whom must have been familiar with it, appear to be ignorant of such a memorandum. Hanner, to whom Coffin showed it, and Pettigrove, to whom it was shown on the witness' stand, both of whom might otherwise have been equally as ignorant, are the only witnesses who disclose a knowledge of its existence. If it had been generally known, and lots had been purchased and the town built up with that knowledge, the fact could have been easily proved. The failure to prove it is equivalent to disproof, when taken in connection with the recent date at which the memorandum apparently was made, and the strange place in which it is found concealed, and the seemingly prevalent ignorance of its existence. We think its binding effect upon the public is not established. And even if it were of binding obligation, the width of the strip has not been proved; and the *inference* of Hanner, from a map shown him by Coffin, that a strip would remain, after taking out the street, is not sufficient without an actual measurement. And furthermore, if such excess *were* found, it does not necessarily follow that it would be private property. The memorandum appears to be the statement of a descriptive fact—that the street, or strip, is of certain widths at certain detached places—rather than a term of limitation appropriating *so much* for street. The language is that *Water-street is so wide at those places.* This is the statement of an existing fact, and may be true or false without changing the fact itself. Indeed, it is but a partial description, for it states the width in front of only half the original blocks. If it be construed as a dedication of so much ground, then it dedicates no ground in front of original blocks 2, 3, 6 and 7, and the five new blocks below, in front of which the strip is continuously marked. The ground dedicated would then be in three small detached parcels, and not a long, continuous " water street." The descriptive memorandum, made subsequent to the act of laying off, marking, and platting the blocks, lots, and streets, is to be understood in the same sense in respect

to all of them.  If any *other* street were wider or narrower than described, surely the excess could not be added to, or the deficiency taken from, the adjacent lots ; and if *lots* were found greater than described, surely the proprietors could not reclaim the excess.  The streets and lots are *marked*, as well as their dimensions given.  The boundaries of Water-street, as marked, are the river on the one side, and the front lots on the other.  If the quantity exceeds the description, the excess may as well be taken from one side as the other—as well next the lots as next the river.  But the rule in all such cases is, that the land within the actual boundaries, and no more, passes by the deed or plat, or other conveyance, be it more or less than the quantity assumed.  The grantor is neither allowed to reclaim an excess, nor required to make up a deficiency.  This being a conveyance, not of *so wide a strip*, but of a *particular* strip, between marked boundaries, *described* as of certain widths at certain places, the memorandum containing that description must give way to, and cannot overrule, those boundaries, if the two conflict.  In no view that we can take of this document, therefore, can it affect the *prima facie* dedication appearing on the face of the plat.

But the documentary evidence is not the only nor the principal basis of the plaintiff's claim.  He insists that the proprietors, in disregard of plats, lines, memorandums and dimensions, did, *in fact*, set off this ground for a street and levee ; and he claims to have proved this by witnesses to the original act of dedication, and to the subsequent conduct and declarations of the proprietors, repeatedly re-affirming it, and to the general belief and expectation of the citizens, thereby knowingly and intentionally produced, and to their public and notorious use of the ground for the purpose of the dedication in pursuance of that belief.  The following is the substance of the testimony relied upon, so far as it relates to the acts and declarations of the original proprietors.  Lovejoy laid out the town jointly with Pettigrove.  Commenced near where the post-office stood in 1852, and ran down the river

to the claim line, allowing sufficient space for a street at the beginning and termination, running a straight line from point to point, without regard to the bend of the river. The front row of buildings is now on this line. " All from the street to the river was to remain as public property, open and free." Understood himself and Pettigrove to be perfectly agreed to this. Warren, in negotiating for lots, objected to one on account of the slaughter-house on the river bank in front. Pettigrove replied it was there temporarily, and could be removed at any time; and he exhibited the original plat, and another with additions, on neither of which were any lots laid out in the strip; and he stated that he did not intend to sell any lots on the bank of the river, nor let buildings go up there. The citizens always claimed it as public, and it was commonly understood to be so. Heard Pettigrove say it was public. *Stephens*—Frequently conversed with Pettigrove about the strip. He always refused to sell lots in it, and said he intended it should remain open as a wharf. Has heard Pettigrove say, when offering to sell lots on this street, .that they were valuable, because the ground in front of them would be left open to the river. *Ross*—Heard Pettigrove say that the strip was to remain open. *Wilson*—Was joint-owner with Pettigrove of block one. It was common report that the river bank was public. *Couch*—Understood Pettigrove, whilst owner, to say the strip was public property. The lots on the west of it were called *front* lots, by Pettigrove as well as others. *Pettigrove*—Did not lay out the strip into lots. Does not remember having told any one it was public property, or that he so intended it. Might have said so when in a pet, or under the influence of intoxicating drink. Lots, 50 by 100 feet. Streets, 60 feet, except *Front*-street, opposite blocks 4 and 5, where it is some 30 or 35 feet, as will be seen by the original plat. Has seen a true copy in the hands of the mayor. [This is the copy in evidence.] *Carter*—Pettigrove held out the inducement to me that I should have the refusal, by gift or purchase, of that part of the strip in front of my lots. At another time, standing at the wharf,

Pettigrove said that property immediately in front would some day make him a fortune. Has heard Pettigrove say it was public property. He was in a little pet after he had sold. *King*—Inquired of Pettigrove and Lovejoy, and they told him the ground was public. Again, in 1850, Pettigrove made the same statement. He was angry with Lownsdale. *Smith*—This ground was generally understood to be a public levee. Never heard it questioned till 1850. The lots on the west side of it were called *front* lots by the proprietors and citizens.

Here is the testimony of one of those who laid out the town, and not contradicted by the other, of an express setting apart of this ground for the use alleged. Pettigrove does not say it was not set apart, but merely that he does not remember having *said* so. Six witnesses, however, testify that he made that statement on more than that number of different occasions. His memory, saying nothing of his veracity, cannot, therefore, be trusted. The defendants brought this witness from Puget Sound, where his deposition could have been taken quite as well, if the facts, as they lay in his memory, were desired, and where he could have testified free from suspicion, in order to take his deposition under their personal superintendence. And yet, after that unusual proceeding, for which he declared he should be well paid, and after opportunity for private conference, they omitted to ask him the question whether, in laying off the town, " All from the street to the river was to remain as public property, open and free;" though the object of that long journey was to disprove that very fact, to which Lovejoy had already testified, and of which he was the only remaining witness. No reason can be imagined for this omission, except the knowledge obtained by those interviews, that, with all his frailties, he could not be trusted to answer that decisive question. It is enough, however, that Lovejoy swears positively to the act of setting it off, and the purpose for which it was done, in which act and intent both proprietors concurred; none of which is denied by Pettigrove; and that this original act of

dedication, thus satisfactorily established, was, for a series of years, repeatedly confirmed by the declarations and conduct of Pettigrove, contemporaneously with a corresponding use of the ground by the public, in full confidence of their right, with his knowledge and without objections, as a mass of testimony shows. This produces unhesitating belief in the mind of the court that the strip was thrown out to the public, precisely as Lovejoy states.

And, without any such original dedication, the abandonment of this land, from 1845 to 1850, to the free and apparently rightful use of the public, of itself, under the circumstances, estops the proprietors from re-asserting their ownership, and render the documentary evidence, and the evidence of express ·dedication, of little consequence; for he who induces the public to believe his land a gift, or knowingly permits them to use and treat it as their own, until they have so accustomed themselves, and adjusted their property and accommodated their business to it, that they cannot, without detriment, be dispossessed, confers a right which he can no more resume without wrong, than he can rightfully seize what was acquired otherwise than by his gift. *Turpe est fidem fallere*, " It is base to disappoint the expectations we have authorized," is the key-note of the common and the civil law, of which equity is compounded. It is a fundamental principle of natural justice, pervading all systems of jurisprudence, ·and common to all countries where man is civilized. (*Rugby Charity* v. *Merriweather*, 11 *East*, 372, note; *Jarvis* v. *Dean*, 3 *Bingham*, 447; *Gamble* v. *St. Louis*, 12 *Missouri*, 617.)

In the *St. Louis Case*, one who had left open an alley through his ground for his private use, and allowed the public also to use it and treat it as a street, for two years, without objection, was held to have dedicated it to the use of the public as a highway, and was denied the right to re-assert his title. No particular length of time is necessary to establish an abandonment of land to the public. It is sufficient if it be *used* by the public, with the assent of the

owner, for *such* time that an interruption would be an injury—each case depending on its own circumstances. (*Cincinnati* v. *White*, 6 *Peters*, 431; and the *St. Louis Case* above cited.)

The concurrence of the testimony with the plat produces a degree of certainty, unusual to litigated cases, that the proprietorship came to the present owners incumbered with the public easement. Of this they had notice, both actual and constructive; for it was open and notorious; and the testimony, which is too voluminous for quotation, fully shows that they recognised and respected the public right, until, after much importunity from some of the witnesses, and, doubtless, others, who had an itching palm for this attractive property, they yielded, one of them after another, to the desire and hope of reclaiming the tempting prize. The testimony of Carter shows that he succeeded in turning the thoughts of Pettigrove wistfully in that direction. The same appliances were brought to bear upon his successors. It was the work of time for the poison to produce its effect; and then the plat, with its front street bounded by the river, had been so long before the public eye, and the public had so long used the whole street accordingly, in the full belief of their right, and the proprietors had so often encouraged that belief by declaring it destined for that use, that the time was passed when it could be rightfully or successfully reclaimed, even if it were not, as Lovejoy proves it was, originally so intended.

The wharf, on which stress is laid, and the slaughter-house, which Pettigrove explained as temporary, are not evidence of private property against such clear proofs of dedication. Even the sale of lots and the erection of permanent buildings have been held not to disprove a dedication otherwise established, as appears by the *Cincinnati Case*, above cited, and the *Lebanon Case*, 9 *Ohio*, 80. Neither is the state of titles in Portland material. In that respect, it is also identical with the *Cincinnati Case*, where the title was in the United States, who had bargained it to Symmes, and he to the town

Parrish v. Stephens.

proprietors; and yet the Supreme Court of the United States held the dedication good.

We have passed over the question whether it was strictly regular for the plaintiff to bring this suit in his own name. If the bill had been demurred to, or the objection taken by the answer, perhaps an amendment would have obviated any real or supposed defect, and so brought the merits to judgment. As the parties appear to have waived technicalities, and to have sought the opinion of the court upon the main question, that alone has received attention.

We have also disregarded the numerous objections to testimony, found scattered through the depositions. A motion to suppress depositions, or parts of depositions, must, in equity, precede the hearing, as at law it must precede the swearing of the jury; because, if suppressed, it may be necessary to continue the cause, or take other steps to replace the evidence thus excluded.

The ground being adjudged a highway and public levee, it becomes a question what order should be made respecting the several buildings erected upon it pending this litigation.

That they were wrongfully placed there, in violation of the injunction, is evident. Even if erected innocently, their removal would be the legitimate result of this decision, unless the public should suffer them to remain. But they occupy an inconsiderable part of a long line of front, leaving above, below and between them abundant space for the public accommodation, both for the present and for an indefinite future. Their removal is not to be ordered by way of retribution, for equity scorns revenge; and it cannot be done at present on the ground of necessity, for their place is not required for the only use to which it can be lawfully devoted.

By the Spanish law, if one erects houses on public ground they must be pulled down, " and if the corporation choose to retain them for their own use, they may do so." And Domat says, " If it should happen that buildings should be constructed on a public square, they might either be demolished, if found convenient, or suffered to stand, on condition of pay-

ing rent or making some other amends to the public, if that be found more advantageous." If this were authority here, we do not see its applicability to the present case. If one wrongfully builds on another's land, the building belongs to the owner of the land. The city is not the owner, but the guardian of this ground. It is the right and duty of the corporation to see that it is kept in a fit state for use, to the extent of the public wants. But having no title in the soil, it can have none in the buildings. These being in the high-way, which is incapable of private ownership, belong to no one unless it be to him who built them. If he neglects to save them by removing them, the public, through the proper authorities, may destroy them, not wantonly, but to clear the ground when needed for its legitimate use.

A decree will, therefore, be entered, declaring the public right, and making the injunction perpetual, and authorizing the city to remove all fences and other obstructions except the permanent buildings, which may remain until the further order of the District Court; to obtain which order, the city may apply by petition for the benefit of this decree, and for further directions whenever the interests of the public shall require it.

### DECREE.

This cause came on to be heard upon the bill of complaint, and the several answers thereto, and the replications, exhibits and testimony, and was argued by counsel. And the court finds that Water-street, in the said city of Portland, is bounded on the east by the Willamette River, from block eight on the south, including the street on the south side of said block, to the claim of John H. Couch on the north; and that the defendants, at the commencement of this suit, were about to obstruct said street, to the special injury of the plaintiff, as stated in the bill. Therefore, it is decreed that the defendants, and all persons claiming under any of them, be, and they hereby are perpetually enjoined from erecting buildings upon, or otherwise obstructing the said street; and that the

defendants, Stephen Coffin, Daniel H. Lownsdale and W. W. Chapman, pay the costs of this suit in equal parts. And the court does not think fit to order the removal, at this time, of the building in the said street; but the city is hereby authorized to petition the District Court for the benefit of this decree, and for further directions, whenever such removal becomes necessary; and, in the mean time, the city may remove, without such order, all fences and obstructions other than tenantable buildings, whenever the public convenience shall require it.