COFFIN and others *v.* CITY OF PORTLAND and another.

*(Circuit Court, D. Oregon. May 12, 1886.)*

**1. LEVEE—DEDICATION TO PUBLIC USE.**

A dedication of real property to public use as a levee or landing on the bank of a navigable water implies and vests in the public a right to use the same without a grantee being named or in existence; and it rests with the legislature, as the representative of the public, to regulate such use, and to promote the same by improving the premises directly, or through the agency of the municipal corporation within whose limits the same are situated or otherwise.

**2. SAME—ACCEPTANCE AND CONTINUANCE OF.**

No formal acceptance of such dedication is necessary; nor does the existence of such easement depend on the extent of the use or improvement of the premises, or that they are used or improved at all.

**3. SAME—DEDICATION FOR A "PUBLIC LEVEE."**

In 1850 the occupants of the Portland land claim dedicated a strip of ground on the river, within the limits of the town they had laid out thereon, as a public levee, and so designated it on the plat of the survey. *Held,* that the intent and understanding was to dedicate the property to public use as a landing place for the use of water-craft, and the transfer of freight and passengers to and from the river.

**4. SAME—POWER OF THE STATE OVER DEDICATION TO PUBLIC USES.**

The state may regulate the use of and improve the public landing, and authorize the collection of tolls for the maintenance of wharves and warehouses thereon, but it has no interest in the property, and cannot devote or subject it to any use clearly inconsistent with the purpose of the dedication, and if it undertakes to do so, the property is not affected by the act, nor will it thereby revert to the donor or his heirs.

**5. SAME—ACT OF 1885, CONCERNING THE LEVEE.**
 The act of 1885, (Sess. Laws, 100,) construed to give the Portland & Walla-met Valley Railway Company the right to use and improve the public levee as a public landing, by the construction of wharves, warehouses, and terminal railway facilities thereon for the public use.

Suit in Equity to Declare and Enforce a Resulting Trust.

*J. G. Chapman,* for plaintiffs.

*A. H. Tanner,* for City of Portland.

*Charles J. Macdougall,* for Portland & W. V. Ry. Co.

DEADY, J. This suit is brought by the plaintiffs to have declared and enforced a resulting trust in a parcel of land in Portland known as the "Public Levee." The case was heard on a demurrer to the bill on the grounds of a want of equity therein and of jurisdiction in the court.

From the bill it appears that the plaintiffs are citizens of Oregon, and the defendants are corporations existing under the laws of Oregon, —the one a municipal and the other a private corporation; that prior to September 27, 1850, Stephen Coffin, D. H. Lownsdale, and W. W. Chapman were in the occupation, as partners, of a tract of land containing about 640 acres, situate on the west bank of the Wallamet river, including said public levee, and then known as the "Portland Land Claim;" that prior to said date said occupants caused said claim to be laid off in lots and blocks, streets, public squares, and places, including a public levee on the bank of the river between the east line of Water street and low-water mark, and extending southerly from the south line of Jefferson street about 520 feet, and about 150 feet in width at the north end, and 350 feet at the south end, and a map thereof to be made, commonly known as the "Brady Map," and then and thereby dedicated said levee to the public, and for more than 20 years thereafter jointly and severally sold and conveyed lots in the town of Portland by said map; that on March 10, 1852, said occupants, in order to comply with the donation act of September 27, 1850, and become settlers thereunder, divided said claim between themselves, whereby said levee was included in the donation of Stephen Coffin, who, during the year 1854, received a patent certificate for the same, upon which a patent was afterwards issued to him by the United States; that at the time of said division said occupants covenanted with each other as follows: "That he will fulfill and perform all contracts and agreements which he has heretofore entered into with the others, or with each of them, or with other persons, respecting the said tract of land, or any part thereof;" that said Coffin continued to recognize said dedication, and between the issuing of said patent certificate and January 23, 1865, sold and conveyed lots within his donation by said Brady map; that the inhabitants of Portland were incorporated by the act of January 23, 1851, and have ever since existed as a municipal corporation by that name, and the common council thereof, on April 29, 1852, adopted said

Brady map, and the same was and continued to be in general use with the knowledge of said Coffin from and after the spring of 1850; that on January 23, 1865, said Coffin executed a deed to Portland, "without consideration," of said "levee tract, in trust, for the use of a public levee or landing," reserving therein to himself all rights for a public ferry thereon, but Portland had no power to take said conveyance, or execute the trust therein contained, and the same is null and void, and in the year 1871, in consideration of $2,500, Coffin executed another deed to Portland, relinquishing the alleged ferry right.

The bill then avers that the deed of 1871 gave Portland no additional right in the premises, the same having been previously dedicated by the grantor both by parol and the deed of 1865, and was only intended to extinguish said ferry right, and to enable the corporation to hold the premises "in trust for the use of a public landing or levee," discharged of such right; that in 1871 said premises were of the value of $50,000, and that in obtaining the conveyance of that year Portland "falsely and fraudulently represented" that it intended "to hold and devote said premises for the use of a public levee or landing," by reason of which representations said Coffin was induced to make the same, and Portland had no right to take said conveyance except to extinguish said ferry right, and the same is void for any other purpose; that neither Portland, the state, nor the public has ever made any use of the premises as a public levee or landing; that said dedication was made in the belief that the same would be advantageous to the public and Portland, but it is contrary to public policy for either Portland or the state to maintain a free public levee or landing at any place in the former, nor could any charge be made for the same consistent with the dedication; that since said dedication was made the unimproved shores and banks of rivers have ceased to be used as a place for the deposit and shipment of goods, and the custom is to use wharves and warehouses, in the construction of which within the limits of Portland there has already been expended $2,000,000, and there is yet river front owned by private persons that may be devoted to such purpose; that the premises cannot be used as a landing or levee unless improved, and it would be contrary to law and public policy for Portland to attempt to collect taxes from the owners of private wharves or other property for the purpose of constructing free wharves thereon, and to become liable for freight deposited there; that the primary purpose of the dedication was for "a public levee," which "is doubtful and uncertain, and unknown to the law, science, or history," and therefore void; that by the act of February 25, 1885, entitled "An act to provide for the construction to the city of Portland of the uncompleted portion of the narrow-guage system of railways now in operation in western Oregon, and to provide terminal facilities therefor upon the public grounds in said city," the trust created by said dedication is "renounced and abro-

gated by the sovereign legislative power of the state," and it is now unlawful for Portland to hold said premises as a public levee, and there arises thereby a resulting trust of said premises in favor of complainants; that said railway company claims the right, under said act of 1885, to appropriate the premises to its use as a depot on making compensation to Portland for any right it may have therein, and "is striving and threatening to obtain possession" of the same for that purpose; that the premises are of the present value of $70,000, and Portland has expended $4,000 thereon; that the plaintiffs are the heirs at law of Stephen Coffin, except Albert Marvin, the husband of Lucinda Marvin, and before commencing this suit they gave notice to Portland that they were willing to repay it all sums of money expended on said levee.    Wherefore they pray that a resulting trust of said premises be declared in their favor, and enforced against the defendant Portland by requiring it to convey the same to the plaintiffs, and that the railway company be declared to have no right to enter upon or use the premises.

The dedication of this property, as a public levee or landing, by Stephen Coffin in 1850, and the continued recognition thereof during his life, is stated and admitted in the bill.    The naked dry legal title was all that remained in him thereafter, and that passed to Portland by his deed of 1865, subject to this easement.    The reservation therein of a private ferry right or landing on the premises was probably void, as being inconsistent with the prior unqualified dedication of the premises to the use of a public levee or landing.    This being so, nothing passed by the deed of 1871, which, according to the bill, was only intended to extinguish this alleged ferry right.    In short, the transaction had no other effect than to give an old pioneer a few hundred dollars, to smooth the path of his declining years, and this was all that was probably intended by those who managed it.

But it is said that the original dedication is void for want of certainty, because the term "levee" is unknown, in the sense of a landing place, "to history, science, or law."    The word comes to us from the French, and in its primary sense signifies a *rising*.    But its signification has been much enlarged.    Among other things it is used to denote an embankment on the margin of a river to prevent inundation,—particularly on the lower Mississippi.    And when this embankment is used as a landing place or quay, as at New Orleans, the levee and the landing become convertible terms.    From this metropolis of the south and south-west, this use of the word passed up the river and its tributary, the Ohio, to St. Louis, Louisville, Cincinnati, Wheeling, and Pittsburgh, where the open bank or slope of the river was used as a landing-place for the use of water-craft and the transfer of freight and passengers to and from them.    And doubtless this is the sense in which it was used by the proprietors, Coffin, Lownsdale, and Chapman, when this dedication was originally made, who, as it is well known, all came from the region of the Ohio river, where

the slope or *rise* from the river in front of the town is or was commonly left open to the public, and used as quay, landing, or levee, sometimes with the aid of wharf-boats fastened to the shore. And this is confirmed by the fact that as late as 1865 Coffin uses the terms "public levee" and "landing," in the deed of that date, as synonymous. And such was also the common and public understanding of the term in this country, as appears from its use by the legislature in section 10 of the act of 1851, incorporating Portland, which gives power to the council "to lay out, regulate, and improve the streets, lanes, alleys, sidewalks, and *public levees* within said corporation," and "to provide for the removal of all * * * obstructions *in* the streets, lanes, or alleys, or *on* the *public levees* thereof." Here the "levees" are classed with the other highways or public easements within the corporation, and placed under its control. And the very discriminating use by the legislature of the prepositions "in" and "on" indicates a practical knowledge of the subject; an obstruction being, so to speak, *in* a street, which is or may be inclosed on both sides, and *on* a levee, bank, or landing that is open on the river side at least.

In *Parrish* v. *Stephens*, 1 Or. 59, 73, (1852,) which was a suit involving the fact of a similar dedication of the river front of the Portland claim north of Jefferson street, the bank is characterized in the opinion of OLNEY, J., as a "highway and public levee," and in the "supplementary opinion" of WILLIAMS, C. J., as the "public levee." On the well-known map of Portland, compiled by Alex. J. Graham, from "Brady's Travalliots and City Maps," and published by S. J. McCormick in 1859, the premises in question are represented as open ground, without a street running through them, and designated the "Public Levee."

In the litigation arising in towns on the Mississippi and Ohio rivers, questions relating to the dedication and use of the river bank or front as a landing for the convenience of river commerce have been considered and decided on the theory that a dedication of such ground to public use implies and vests in the public a right to use the same as a highway, quay, landing, or levee, without any grantee being named or in existence; and that the legislature, as the representative of the general public, may regulate such use, and promote the same by the improvement of the premises, directly or through the agency of the corporation within whose limits the same are situated. *Cincinnati* v. *White*, 6 Pet. 435; *Barclay* v. *Howell*, Id. 498; *New Orleans* v. *U. S.*, 10 Pet. 662; *Rowan* v. *Portland*, 8 B. Mon. 232; *Godfrey* v. *Alton*, 12 Ill. 29; *Gardiner* v. *Tisdale*, 2 Wis. 153. And when, as in this case, the dedication is unconditionally made to a public use, as a levee or landing-place, no formal acceptance of the same is necessary; nor does the existence or continuance of the easement depend on the extent of the use or improvement of the premises, or that they are used or improved at all; and it is even doubtful if the same

can be lost by the adverse occupation of the premises by private parties for any length of time.    2 Dill. Mun. Corp. (3d Ed.) § 675.

Taking the case made in the bill, by the facts stated therein, without reference to the averments concerning their legal effect, which are more in the nature of argument than otherwise, it appears that the use of this property, as a highway or landing-place, was given to the public by the plaintiffs' ancestor long prior to the execution of and irrespective of the deeds of 1865 and 1871.    At any time thereafter the legislature, as the representative of this public, had the power to authorize the corporation of Portland to improve the premises as a landing, and to make regulations concerning the use of the same, or to make provision to that end directly, or to leave the property in its natural condition, subject to such use, as a landing, as could under the circumstances be made of it.    It might also construct, or authorize the corporation or any individual to construct and maintain, wharves and warehouses thereon, and impose and collect a toll for the use of the same, sufficient at least to defray the cost and expense of these aids and conveniences to travel and transit thereon.    But neither the state nor Portland has any interest in this property to dispose of; nor can either of them devote or subject it to any use clearly inconsistent with the purpose of the dedication.    And if the legislature should undertake to do so, the property would not therefore revert to the donor, or the easement be lost to the public, but any person injured thereby might maintain a suit against the proper parties to enjoin the same.    It follows from these premises that, so far as the plaintiffs are concerned, it matters not whether Portland has or ever had any authority to regulate the use of or improve the premises for the purpose of the dedication; or whether it could or did take any interest therein by operation of the deeds of 1865 and 1871.

But it may not be amiss to refer briefly to the legislation bearing on that subject.    By the act of 1851, *supra,* as we have seen, Portland was authorized to regulate and improve the "public levees" within its limits, including this one, of course, as well as the bank of the river north of Jefferson street, which was subsequently (1861) found not to have been dedicated, (*Lownsdale* v. *Portland,* Deady, 2;) and to remove all obstructions therefrom.    By the same act (6) the corporation was authorized "to acquire" real property for the use of the corporation.    This act was superseded by the one of October 14, 1864, (Sess. Laws, 2,) which dropped the word "levee," and provided, among other things, (section 2,) that the corporation might "purchase, hold, and receive" real property within its limits for "public buildings, public works, and city improvements."    This was followed by the act of October 24, 1882, (Sess. Laws, 144,) which was a mere compilation of the act of 1864, and sundry additions and amendments made thereto in the mean time, but made no change in the law in this respect; and section 2 of the act was again amended

by the act of November 25, 1885, (Sess. Laws, 102,) without being altered in this particular.

From this it appears that since October 14, 1864, if not before, Portland has been authorized "to purchase, hold, and receive" real property for "city improvements." This is a general and comprehensive provision; and unless limited in its operation by some other enactment, to which attention has not been called, it includes property intended for a public square, park, landing, levee, or the like. 2 Dill. Mun. Corp. (3d Ed.) §§ 562–564. And under the grant of power contained in section 37, subds. 1, 2, of the act of 1864, and the following ones, to levy and collect taxes for general municipal purposes, and for "any specific object" within the authority of the corporation, it is not apparent why Portland is not authorized to improve such square, park, landing, or levee in any way that may be calculated to promote its usefulness or improve the city.

The fact that the river front is generally in the hands of private parties, on which wharves and warehouses are maintained by private enterprise, has no bearing on the question of the authority of Portland in the premises, or the power of the legislature to confer, withhold, or withdraw the same at pleasure. What is a wise or the best policy in the premises is a matter for the legislature in the first instance, and the corporation in the second. Under the circumstances, it would be sheer assumption for the court to say that it is contrary to public policy for Portland to have a public landing or levee on the river bank, or to improve and maintain the same, either directly or through the agency of third persons.

The act of February 24, 1885, (Sess. Laws, 100,) which the plaintiffs allege is a "renunciation" by the state of the trust arising from the dedication of this property to public uses, is largely a mass of senseless and redundant verbiage; but so far as this case is concerned, it may be shortly stated as a grant or license to the defendant the Portland & Wallamet Valley Railway Company, then and now engaged in constructing a road between Portland and Dundee, the use of a levee for a depot, and the wharves and warehouses necessary and convenient for receiving, storing, and shipping freight, on condition, among others, that said company shall not charge any vessel for "dockage" while receiving or discharging cargo at any wharf on the premises.

The act also contains a provision to the effect that nothing therein shall be construed "to take away any pecuniary (?) or property rights" that Portland may have in the premises, and which the state cannot "lawfully appropriate;" nor to deprive the same of any "legal claim or remedy it may have to (?) damages in consequence of the appropriation of said public levee;" and that the company shall not sell or assign "the premises or rights" thereby granted, otherwise than as an "appurtenant" of said railway. As the state has no power to "appropriate" or "grant" this property otherwise than to provide for and

regulate its use as a public landing, the language of the act is not well chosen, and is susceptible of a construction that would give it effect beyond the power of the legislature in the premises. But giving it effect within such power, and construing it accordingly, as the court is bound to do, if it can, the act is a grant to the defendant of the right to improve and use the premises as a public landing, with the added facility of direct and immediate railway connection therewith. The company is so far the agent of the state; and in consideration of the advantage of being allowed access to ship navigation at this point, and the right to maintain a depot thereat, undertakes to furnish the public with suitable wharf and warehouse facilities there for the transaction of business, including free "dockage" for vessels engaged in loading or discharging cargo. And as Portland has no "pecuniary" or other right in this property, except as trustee, and then only so far as the legislature may provide or permit, it is not apparent what claim it can have for damages in consequence of its "appropriation" to such uses and purposes. 2 Dill. Mun. Corp. (3d Ed.) §§ 567–573.

Nor is it apparent how the operation of this act impairs the obligation of any contract concerning this property, and especially to the injury or prejudice of these plaintiffs; for no one can be heard to question the validity of an act of the legislature on the ground that it impairs the obligation of a contract, without showing that such impairment works an injury to him of which the law will take cognizance. The learned counsel for the plaintiffs states their case in this respect on this wise:

"In the case at bar the federal question of the power of the legislature to devote the property to the railroad's use, forms an ingredient in the original cause of suit. The right of reversion to the donor or his heirs, and the power of the legislature to destroy that right of reversion, are the principal points in the case; and a determination of the power of the legislature is indispensable to a determination of the suit upon the other point. The relief prayed for will be allowed or rejected according to whether the act be determined to be valid or invalid."

But if the act is invalid for any cause, no one can claim any right under it, and for the same reason no one can be deprived of any right by it. The argument involves the novel proposition that the legislature, by the passage of a void act, whereby it undertook to divert the use of this property from the public to a private corporation, has caused the right of the public therein to be forfeited, and the property to revert to the donor or his heirs, discharged from the easement. This is making one person answer for the sins of another, with a vengeance. The mere statement of the proposition ought to be a sufficient answer to it. The public, to whom the use of this property was dedicated by Stephen Coffin, is not responsible for the illegal acts of the legislature; and for that matter they do not bind or affect any one.

But it is not conceded that there is any implied contract accompanying or growing out of this dedication; that the public will make any particular use of the premises, except when and as it may suit its convenience or the public good; nor that the same shall revert to the donor or his heirs in case of any failure of the public to use the same, or any attempt on the part of the state or Portland to divert the property to some use other than the one intended by the donor. Where the fact of dedication of a street or landing is in dispute, non-user is evidence, more or less cogent, according to circumstances, against a dedication. But where, as in this case, the dedication is admitted, the evidence of non-user is immaterial. The right to the use, once admitted, is not affected by it. *Barclay* v. *Howell,* 6 Pet. 505. Property dedicated to public use does not revert to the donor, unless, it may be, where the execution of the use becomes impossible; and if such property is appropriated to an unauthorized use, a court of equity will compel a specific execution of the trust, by restraining the parties engaged in the unlawful use or by causing the removal of obstructions or hindrances to the lawful one. *Barclay* v. *Howell,* 6 Pet. 507. See, also, 2 Dill. Mun. Corp. (3d Ed.) § 653.

The bill is clearly without equity; and, in my judgment, the case made by it does not involve a federal question.

The demurrer to the bill is sustained, and the same is dismissed.