LONDON & SAN FRANCISCO BANK, Limited, v. CITY OF OAKLAND et al.

(Circuit Court, N. D. California. March 14, 1898.)

No. 12,190.

1. DEDICATION OF STREET—FILING OF MAP—ORDINANCE OF ACCEPTANCE.
   A map of a town in California was sworn to by the owners of the land August 3, 1853. A deed of partition among the owners was executed August 15th, making express reference to the map; and an ordinance was passed August 27th, declaring the streets laid down and described on the map public streets and highways. The map was filed for record September 2d following. *Held*, that the acceptance took effect and the dedication became complete immediately on the filing of the map.

2. SAME—ADVERSE POSSESSION—NONUSER.
   That only a portion of a street which has been dedicated and accepted as a public street is opened up does not devest or impair the right of the public to open and use the remaining parts whenever the exigencies of public travel and wants require it.

3. SAME.
   It being a rule of property in California that title cannot be acquired to public property by adverse possession, the right of a city to open up a street once dedicated and accepted is not impaired by the fact that it has been fenced for about 40 years, and occupied as a residence the greater part of the time, and that valuable buildings have been erected upon it.

Suit in equity to enjoin the city of Oakland and its officers from entering upon the lands of the complainant, and from using, or attempting to use, the same as a public street, and to quiet the title of the complainant to the land as against the defendants. Upon the filing of the bill, an order to show cause was issued, and a temporary restraining order granted, which was subsequently continued until the final disposition of the case.

Page, McCutchen & Eells, for complainant.
J. K. Piersol and W. A. Dow, for defendants.

MORROW, Circuit Judge. This is a suit in equity, brought to enjoin the city of Oakland and its officers from entering upon the land of the complainant, and from using, or attempting to use, the same as a public street, and to quiet the title of the complainant to the said land as against the defendants. Upon the filing of the bill, an order to show cause was issued, and a temporary restraining order granted. The order, upon the hearing, was continued in force by consent until

the final disposition of the suit. The defendants interposed a sworn answer, to which the complainant filed its replication. The principal facts in controversy have been stipulated between the parties. Some additional testimony was, however, introduced on behalf of the defendants. The stipulation of facts is as follows:

"That complainant was incorporated, as averred in its bill. That the map mentioned in respondents' answer was filed and recorded by the persons from whom complainant deraigns title, and who were the owners in common of a tract of land embracing the land in controversy and the other lands shown on said map, on September 2, 1853; and that the copy attached to the answer, and marked 'Exhibit A,' is a full, true, and correct copy of said map. That the Rancho De San Antonio was granted by the Spanish governor of California in 1820, to one Luis Peralta, who divided it among his sons, to one of whom, Vicente Peralta, he allotted the land bounded on the west by the Bay of San Francisco, on the south and east by the Estuary of San Antonio (designated on the Kellersberger map as 'Bay of Contra Costa' and 'Bayou'), and on the north by a line extending from the Bay of San Francisco to said estuary, and lying north of the most northern tier of blocks shown on said Kellersberger's map. That the claim of Vicente Peralta to said land was confirmed in 1854 by the board of commissioners appointed by act of congress to inquire into California land grants of Spanish or Mexican origin; and, on appeal to the United States district court, said confirmation was affirmed in 1855, and the supreme court of the United States, in U. S. v. Peralta, 19 How. 343, affirmed said decision, and patent accordingly has issued from the United States conveying and confirming said lands to the successors in interest of Vicente Peralta. That, at the date of filing said Kellersberger map, the owners signing the same (who have succeeded to all the rights of Vicente Peralta in all said lands so allotted to him) owned a tract of land embracing all the lands laid off in blocks by the Kellersberger map, and all the land surrounding the portion so subdivided into blocks, and extending therefrom to said exterior boundaries of the Vicente Peralta allotment. That said exterior strip or margin was not partitioned by said partition deed, but remained in undivided and common ownership for upward of ten years thereafter, unless the court shall hold that the premises in controversy were dedicated by said map to the public as a portion of Fallon street. That said map was made by said owners for the purpose of a partition and allotment of the blocks thereon laid down amongst themselves: and on the said 15th day of August, 1853, simultaneously with the filing of said map for record, said owners made partition of said blocks, allotting the same amongst themselves by the numbers and designations of the various blocks thereof as laid down, numbered and designated upon said map, and executed amongst themselves reciprocally a deed of partition whereby block 166 (but not the lands in controversy) was allotted and conveyed in severalty to John C. Hays and John Caperton, two of said owners; and the title of the complainant in this suit to the land in controversy is derived from said tenants in common by conveyances executed by them subsequently to said partition deed. The title to said block 166 is vested in other persons, not parties to this action, who hold the same under conveyances executed by said Hays and Caperton. That, after said partition was made, the respective parties thereto sold and conveyed the lands in their respective allotments to various persons, and from time to time describing the parcels in the conveyances executed by them by the numbers and descriptions thereof as shown upon said map, and referring to said map by its title of 'Kellersberger's Map of Oakland' for particularity of description. That about the year 1855, and at all times since, the land in controversy in this action was and is inclosed by substantial fence, and since 1858 it has been occupied as a residence. That the land claimed by respondents' answer to be a portion of Fallon street adjacent to complainant's property has never been actually opened or used as a street, but that other portions of Fallon street, to wit, from Sixth street to Eighth street, inclusive, have been for many years so opened and used by the public under the dedication made by the deed of partition and the said map. That the premises are now improved as stated in complainant's complaint, and are of the value therein stated. That the board of trustees of the town of Oakland, on the 27th day of August, 1853, passed and adopted an ordi-

nance of which a copy is hereto annexed, marked 'Exhibit B.' That the streets running north and south, as laid down on said map, including Fallon street, are 80 feet wide; but the complainant does not admit the respondents' contention that by the facts hereinbefore set forth, or by any other facts, Fallon street extends further north than Tenth street."

The ordinance declaring the streets in the town of Oakland public highways reads as follows:

"The board of trustees of the town of Oakland do ordain and resolve as follows:

"Section 1. The following streets in the town of Oakland, as laid down and described on Kellersberger's map of Oakland, are hereby declared public streets and highways, to wit: West street, Brush street, Castro street, Grove street, Jefferson street, Clay street, Washington street, Broadway, Franklin street, Webster street, Harrison street, Allice street, Jackson street, Julia street & Oak street. Said streets are 80 feet wide, except Broadway, which is one hundred and ten feet wide, and all run in direct line from high-water mark to a line two hundred feet north of the northern line of 13th street; * * * also so much of First or Front street and *so much of Fallon street as are above high-water mark.*

"Sec. 2. It shall not be lawful for any person to fence across said streets, or to erect buildings therein, or in any way to obstruct the free passage of said streets, or of any one of them. Any violation of this ordinance shall be punished by fine of," etc.

"Sec. 3. It shall be the duty of the marshal to remove any and all obstructions placed in the streets contrary to the provisions of this ordinance, and for this purpose he may proceed without warrant or process to remove the same.

"Passed August 27th, 1853.
    "[Signed]        A. W. Barrell, President of Board of Trustees.
    "[Signed]        A. S. Hurlbutt, Clerk of the Board of Trustees."

The map known and designated as the "Kellersberger Map of Oakland" was introduced in evidence. As stated in the stipulation of facts, it was filed and recorded on September 2, 1853, and it was testified at the hearing that it had always been considered as the official map of Oakland. It shows blocks and streets regularly laid out, the blocks being systematically numbered, and the streets properly named and designated. The deed of partition executed August 15, 1853, makes express reference to this map; and, as the stipulation shows, "said map was made by said owners for the purpose of a partition and allotment of the blocks thereon laid down amongst themselves." That the filing and recording of this map amounted to a dedication of the streets laid out and designated on the map, and that this dedication became irrevocable when accepted by the proper public authorities, is well settled. Irwin v. Dixion, 9 How. 12; City of Cincinnati v. White, 6 Pet. 431; Barclay v. Howell, Id. 498; New Orleans v. U. S., 10 Pet. 662, 714; Grogan v. Town of Hayward, 4 Fed. 161; Simplot v. Railway Co., 16 Fed. 350; Gregory v. City of Lincoln, 13 Neb. 352, 14 N. W. 423; Hurley v. Boom Co., 34 Minn. 143, 24 N. W. 917; Hanson v. Eastman, 21 Minn. 509; Warden v. Blakley, 32 Wis. 690; Rowan's Ex'rs v. Town of Portland, 8 B. Mon. 232, 238; Yates v. Judd, 18 Wis. 126; People v. Reed, 81 Cal. 70, 22 Pac. 474, and cases there cited; 2 Dill. Mun. Corp. (2d Ed.) p. 606, and cases there cited; Elliott, Roads & S. p. 111 et seq.; 5 Am. & Eng. Enc. Law, p. 407, and cases there collated.

It is objected that there was no valid acceptance, for the reason that the ordinance of August 27, 1853, declaring the streets laid down and

described on the Kellersberger map of Oakland as public streets and highways, is not sufficiently specific. This objection is clearly untenable. A comparison of the streets as laid down and described on the map referred to will be found to agree exactly with the streets named and designated in the ordinance.

It is further contended that the fact that the ordinance was passed on August 27, 1853, while the map itself was not filed and recorded until September 2, 1853, some five days subsequent, is a fatal defect to a valid acceptance. This objection also is untenable. The deed of partition, which made express reference to the Kellersberger map, was executed and filed for record on August 15, 1853. The map had evidently been made previously, for it was sworn to on August 3, 1853. The map was therefore in existence when the deed of partition was filed for record. It was actually filed for record in the county recorder's office on September 2, 1853, only five days after the resolution declaring the streets laid down in the map to be public streets was passed. The moment the map was filed for record, the dedication became complete, and the acceptance took effect. That the complainant was not prejudiced in any rights then held by it to the land in question by this order of the proceedings is plain.

The property in dispute is situated on what is claimed by the city of Oakland to be the continuation of Fallon street. Generally described, it may be said to be that portion of Fallon street opposite the north half of block 166. It is more particularly described in the bill as beginning at a point on the southeasterly line of Twelfth street distant thereon 300 feet easterly from the southeast corner of Twelfth street and Oak street; running thence easterly, along said southerly line of Twelfth street, 85 feet; thence, at a right angle, southerly 100 feet; thence, at a right angle, westerly 85 feet; and thence, at a right angle, northerly 100 feet, to the point of beginning. It is contended by the city of Oakland that this land, excepting about 5 feet of the easterly part thereof fronting on Twelfth street, and extending of equal width southerly 100 feet, was dedicated to the public use as being a part of Fallon street, and was accepted as such by the resolution contained in the ordinance of August 27, 1853. It will be observed from a reading of the resolution that "so much of Fallon street" as is "above high-water mark" is declared to be a public street. An examination of the Kellersberger map shows that Fallon street is the highway nearest or next to the creek designated on the map by the name of "Bayou"; hence the wording of the resolution declaring it a public street. That the property in controversy was and is now above high-water mark is abundantly established by the testimony of the witnesses introduced on the part of the defendants, as well as by the fact that the bill itself shows that the land is 85 feet wide, and contains a house and other improvements. The width of the streets, as fixed by the ordinance, is 80 feet, with the exception of Broadway, which is fixed at 110 feet. The stipulation of facts also shows that Fallon street from Sixth to Eighth streets has been used for many years as a public street. It is conceded by the complainant, in the stipulation of facts, that Fallon street extends to Tenth street. The property in dispute lies between Eleventh and Twelfth streets. It further appears

86 F.—3

that the land in controversy had never been opened up or used as a public street, but that it was fenced in about 1855, and has been occupied as a residence since 1858. The buildings and other improvements are claimed to be of the present value of at least $2,500.

The fact that, by the stipulation, it is admitted that a portion of Fallon street was opened up and actually used as a public street, militates, in my opinion, very strongly against the claim of the complainant that the land in controversy, which, as the map shows, lies in the direct line of a continuation of Fallon street, was never dedicated as a public street. The fact that only a portion of Fallon street was opened up and used as a public street does not devest or impair the right of the public to open up and use the remaining portion of the land, dedicated and accepted as a public street, whenever the exigencies of the public travel and wants require it. Barclay v. Howell, 6 Pet. 498, 505; City of Boston v. Lecraw, 17 How. 431; Potomac Steamboat Co. v. Upper Potomac Steamboat Co., 109 U. S. 672, 684, 3 Sup. Ct. 445, and 4 Sup. Ct. 15; Coffin v. City of Portland, 27 Fed. 412, 420; Coffin v. City of Portland (Or.) 17 Pac. 580; Rowan's Ex'rs v. Town of Portland, supra; Grogan v. Town of Hayward, supra; Town of Derby v. Alling, 40 Conn. 410; Heitz v. City of St. Louis (Mo. Sup.) 19 S. W. 735. As was said by Judge Deady in Coffin v. City of Portland, supra: "The right to the use, once admitted, is not affected by it."

An examination of the map itself shows the necessity of an unobstructed highway to Twelfth street. Almost at the junction of Fallon and Twelfth streets, assuming that Fallon street were fully opened up, is the Twelfth Street Bridge, which affords the means of crossing the "Bayou," so called, at that time. This bridge was in existence in 1853, when the partition of the land was made and the Kellersberger map filed for record. Opening up Fallon street between Eleventh and Twelfth streets, thereby passing over the land in dispute, would give the public traveling up (northward) on Fallon street a direct access to this bridge; otherwise, it would be necessary to go up Oak street, one block further away. As the land in controversy is a part of Fallon street, as the same is delineated on the Kellersberger map, and I find it has been dedicated and accepted as such, it follows that the complainant is a mere trespasser, and has no remedy or redress against the threatened acts of the public officials of the city of Oakland in removing the improvements thereon, and clearing the land for a public street, unless it may be that the public is estopped, by some act or failure to act, from asserting its title, held in trust for public purposes, to the land. As shown by the stipulation of facts, the complainant deraigns its title from the several tenants in common, who partitioned the land with express reference to the Kellersberger map. When title was acquired to this particular piece of land does not clearly appear; but it does appear that no attempt was made by the public authorities to open up and use the land as a public street until 1894, when a notice was sent by the public officials of the city of Oakland to clear the land, and remove the buildings and improvements thereon. As stated, the land was dedicated in 1853, and the first attempt, so far as the evidence shows, to open up and use as a street the land in controversy, was made in 1894, some 41 years later. In view of the fact that the land was fenced in about 1855, and that it has been

occupied as a residence since 1858, buildings and improvements of considerable value having been meanwhile erected, a strong equity would seem to arise in favor of the complainant, and give weight to the view that the city of Oakland had lost its right to the land by the adverse possession of the complainant. But, whatever may be the rule of decision in other states on this feature of the case, it is the well-settled law of the state of California, repeatedly so declared by its supreme court, that a title cannot be acquired to public property by adverse possession. Hoadley v. San Francisco, 50 Cal. 265; People v. Pope, 53 Cal. 437; City of Visalia v. Jacob, 65 Cal. 434, 4 Pac. 433; San Leandro v. Le Breton, 72 Cal. 170, 13 Pac. 405. These decisions, declaring, as they do, a settled rule of property in this state, are conclusive on this court. Grogan v. Town of Hayward, supra; Kowalski v. Railway Co., 84 Fed. 586. See, also, Elliott, Roads & S. p. 660.

On the whole of the case, I conclude that, while the equity in favor of the complainant's right to the land in controversy may be very strong by virtue of the long nonuser by the city of Oakland of it for public purposes, still it is not sufficiently potent to justify this court in overriding the well-settled rules of property declared by the supreme court of this state. The complainant's position may be an unfortunate one, but the stability and security of the public rights are deserving of no less consideration. The bill will therefore be dismissed, with costs in favor of the defendants, and the restraining order will be discharged; and it is so ordered.